UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARION MERRITT-RUTH and SIDNEY
GURLEY, JR.,                                    Case No. 14-12858

       Plaintiffs,                                    Honorable Nancy G. Edmunds

v.

OFFICER SUSAN FREY-LATTA, OFFICER
THOMAS BLAIR, and BETH FRITZ,

       Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [86]**

Plaintiff-decedent Sidney Gurley ("Gurley") was a detainee at the Gus Harrison Correctional Facility when he began to experience abdominal pain, diarrhea, bloody urine, and loss of appetite. Shortly after reporting his symptoms to prison officials, he was sent to the infirmary and seen by Defendant Beth Fritz, R.N. ("Fritz" or "Nurse Fritz"). While it is unclear exactly how Gurley presented to Fritz, she ultimately concluded that he was suffering from a urinary tract infection, and requested the attending physician to prescribe antibiotics. Unfortunately, Gurley was never examined by the physician, and Fritz's diagnosis was inaccurate. The following morning, Gurley passed away after suffering from acute peritonitis caused by a ruptured appendix. This civil rights action was initiated against the officers and medical personnel that interacted with Gurley in the hours leading up to his death.

Currently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. 86). Plaintiff's complaint is premised on the

Eighth Amendment, with two closely related state law claims. In the end, the Court finds that there are factual questions bearing on the reasonableness of the Officer Defendants' response to Gurley's serious medical condition. Accordingly, for the reasons stated more fully below, the Court GRANTS IN PART Defendants' motion.

## I.  Factual Background

The facts giving rise to this dispute revolve principally around a period of 24 hours beginning on August 5, 2011. That morning, Gurley approached Officer Aaron Jones ("Jones" or "Officer Jones") holding his stomach and complaining that "he had blood in his [] bowel movements" and "severe abdominal pain." (Plf.'s Resp. Ex. 5, Jones Dep. Tr. 12:24-25; 20:24-25). Consistent with Michigan Department of Corrections ("MDOC") policy, Jones called the prison infirmary–possibly for the second time concerning this issue, the record is unclear–and requested approval to send Gurley down for treatment. (Jones Dep. Tr. 20:3-7). At approximately 8:47 a.m., Gurley arrived at the healthcare unit and was met by Defendant Nurse Fritz. According to the "nurse protocol" completed by Fritz, Gurley complained of nausea, vomiting, and abdominal pain, and noted that he "was trickling urine, orange and red, . . . didn't poop for 3 days . . . then diarrhea for 3 days, then pooped formed yesterday[;] after eating last two days I had to go right to the bathroom." (Defs' Mot. Ex. A, August 4, Gurley Med. Record 007.).

After considering Gurley's initial comments, Fritz maintains that she:

> palpated (or touched) all four quadrants of Mr. Gurley's abdomen and then listened with a stethoscope . . . . Initially, when I listened, bowl sounds were not present, indicating constipation . . . Mr. Gurley had been given a laxative during this appointment and left the examination to use the restroom. When he returned, Mr. Gurley stated that he "pooped", that it was formed, and that he felt better. I again checked for bowl sounds, which were present in all four quadrants. When I palpated Mr. Gurley's left upper quadrant . . . he did not

> appear to be in any distress. Mr. Gurley declined any pain medications . . . and indicated that he had not taken any pain medication previously for his illness.

(*Id.* at Ex. A, Fritz Aff. ¶ 5). Notably, this portion of Fritz's account does not appear in the nurse protocol completed during Gurley's appointment. Rather, it was incorporated as an "addendum" days after Gurley died. *See* (*Id.* at Ex. A, Gurley Med. Record 006). According to Fritz, Gurley's records were "updated [after the fact] due to computer failure. . . ." (Plf.'s Resp. Ex. 14). In any event, Fritz's clinical observations led her to believe that "Mr. Gurley was experiencing a urinary tract infection ['UTI']." (Ex. A, Fritz Aff. ¶ 6). A test of Gurley's urine "revealed that there were white blood cells present . . . indicating possible infection." (*Id.*).

Armed with Gurley's test results, Fritz approached Savithri Kakani–the attending Physician's Assistant–for a diagnosis. Kakani testified that Fritz never disclosed that Gurley originally presented with "zero bowl sounds", and seemingly left out his complaints of vomiting and abdominal pain. (Plf.'s Resp. Ex. 12, Kakani Dep. Tr. 180:1-7; 171:4-5) (Q. "And are you positive that you were told only about the UTI? A. Yes."). This is significant, Kakani maintained, "because it could potentially be life-threatening." (*Id.* at 181:9-11). Instead, Fritz opted to focus on Gurley's positive urinalysis, explaining that, "I think this patient has UTI, he has leukocytes in his urine." (*Id.* at 88:12-19). When asked whether Gurely had any abdominal pain or "other symptoms", Fritz purportedly responded "no". (*Id.*). In the end, Kakani never personally examined Gurley, and agreed, based on Fritz's observations, that he was likely suffering from a UTI.[1] Gurley was prescribed a round of

---

[1] The Estate settled its claims against Kakani and she was dismissed from this lawsuit.

antibiotics and given a medical lay in; "meaning that he was excused from participating in work or school assignments for the next two days following the visit." (Defs,' Mot. Ex. A, Fritz Aff. ¶ 6).

Gurley's condition upon leaving the infirmary is the subject of considerable debate. According to Fritz, Gurley "voiced understanding of the given instructions and ambulated without difficulty out of the healthcare clinic." (*Id.*). He was not "guarding his stomach" or "bent over." (Plf.'s Resp. Ex. 13, Fritz Dep. Tr. 71:13-21). Gurley's fellow inmates, on other hand, have a very different memory. Joseph Hamilton recalled seeing Gurley after "he came out of [h]ealth [c]are that morning, . . . [looking] even worse. He could barely stand up. He was bent over." (*Id.* at Ex. 10, Hamilton Aff. ¶ 6). Donald Rocker likewise testified that Gurley "was walking very, very slowly, bent over, holding his stomach. He told me the pain was killing him and he told that to the nurse, but she did nothing for him, just saying it was a UTI." (*Id.* at Ex. 10, Rocker Aff. ¶ 3).

Upon returning to his cell, Gurley encountered Officer Jones and explained that he was diagnosed with a UTI. (*Id.* at Ex. 5, Jones Dep. Tr. 16:12-14). Jones did not indicate whether Gurley appeared to be in pain at that moment. Around 2 p.m., Jones was replaced by Defendant Officer Thomas Blair ("Blair" or "Officer Blair"). Gurley knew Blair well; he worked as a second shift porter so he would frequently communicate with Blair "in order to get his supplies and stuff he needed to complete his job." (Plf.'s Resp. Ex. 19, Blair Dep. Tr. 11:7-8). Prior to August 5, Blair maintains that Gurley never raised any medical concerns.[2] (*Id.* at Tr. 11:17-24). That evening, however, Blair was approached by inmate

---

[2] This is consistent with the testimony of Terry Pruitt, a "cube mate" of Gurley's, who indicated that on "August 4, 2011, Mr. Gurley reported to me that he felt a little bit better.

4

Rodney Stevenson ("Stevenson") who indicated that "Gurley should be taken to healthcare because he did not look good and because he appeared to be in pain." (Plf.'s Resp. Ex. 8, Stevenson Aff. ¶ 5). Blair then questioned Gurley, who reported that "he was having stomach issues and blood in his stool." (*Id.* at Ex. 19, Blair Dep. Tr. 12:17-18). Moments later, Blair testified that he contacted healthcare, relayed Gurley's symptoms, and was granted clearance to send him back down for treatment. (*Id.* at Tr. 13:13-19); (Tr. 14:23-25) ("when I relayed the information, they . . . stated afterwards that [Gurley] had been to [healthcare] earlier in the day and they'd be willing to talk to him . . . .").[3] Hamilton likewise testified that Gurley was sent back to the infirmary during Blair's shift. (Ex. D, Hamilton Dep. Tr. 39:11-14).

Blair's account is contradicted by inmates Robert Jones ("R. Jones") and Stevenson. According to R. Jones, "I was with [Gurley] when officer Blair had contact with him . . . we begged Blair to please call Health Care and send [him] over there. Blair just refused. He said he wouldn't send [him] over there because [he] had already been over to Health Care once earlier that day." (Plf.'s Resp. Ex. 18, Jones. Aff. ¶¶ 7-11). Similarly, Stevenson maintains that "Blair told me that Mr. Gurley had already been to healthcare that day." (*Id.* Ex. 8, Stevenson Aff. ¶ 5). In either case, Blair testified that he "made numerous rounds throughout the day and evening, and [Gurley] was laying his bed, you know, [resting]." (*Id.*

---

He even worked out that day." (Plf.'s Resp. Ex. 8, Pruitt Aff. ¶ 6); *see also* (Ex. 8, McPharlin Aff. ¶ 5) ("I instructed Mr. Gurley that I thought he should be go to health care, [but] he resisted at first because I do not think he wanted to pay the co-pay required . . . and did not report the problem to a staff member until about 2-3 days before his death).

[3] Blair testified that Gurley's appointment was documented in a pass log "that's put into a file . . . and it's kept for 30 days." (Ex. 19, Blair Dep. Tr. 16-17). The log corresponding to Gurley's visit was purportedly destroyed before this litigation was initiated.

Tr. 15:12-14). Shortly before the end of his shift, Blair followed-up with Gurley on his way to the restroom. Gurley reportedly indicated that "he felt a little better, . . . was going to follow [h]ealth [c]are's instructions and rest. And they said that they were going to call him out [to the clinic] in the morning." (*Id.* at Tr. 15:16-19).[4]

Defendant Officer Sandra Frey-Latta ("Latta" or "Officer Latta") relieved Officer Blair, working the overnight shift in Gurley's unit. Latta approached Gurley that evening to inquire about his medical lay-in status. According to Latta, their conversation went something like this:

> I basically asked him if he had gone to the doctor's and he said yes. And I asked him did you find out what was wrong . . . [a]nd he said yes, he did, and he found out he had a [UTI]. [I told him] if you need to see Health Care let us know. And the yard officer stated 'I'm not doing anything. So if you need to go just let me know and I'll walk you up. And [Gurley] stated something about he was working in the weight pit earlier that day . . . and also that he had a doctor's appointment the next morning so he didn't need to see Health Care.

(Plf.'s Resp. Ex. 23, Latta Dep. Tr. 13:4-14). Latta further remarked that Gurley "appeared fine" was "walking normally" and did not appear to be in distress. (*Id.* at Tr. 24:1-11). Officer Michael Curtis, working alongside Latta, confirmed much of her testimony, and further noted that Gurley "indicated he did not need to go [to the clinic] as he was already scheduled for a call-out appointment . . . the following morning." (Defs.' Mot. Ex. G, Curtis Aff. ¶ 3).

James Street ("Street"), an inmate housed in Gurley's unit, has a very different recollection of the events taking place during Latta's shift. According to Street, around 10:30 p.m. he "followed Gurley down the hall on the way to the restroom. [Latta] saw

---

[4] Gurley's name was handwritten on the "nurse sick call" list for August 6, 2011. (Def.'s Mot. Ex. F, Sick Call Log).

6

Gurley bent over walking slowly, groaning in pain holding his stomach clearly in severe discomfort. [Latta] said nothing . . . . The [vomiting] sounds Gurley made [in the restroom] were loud enough where [Latta] would have been in a position to hear them." (Plf.'s Resp. Ex. 22, Street Aff. ¶ 2). Despite his concern about Gurley's well-being, Street testified that he "never told . . . Latta [or any other staff member] that Mr. Gurley was having trouble and that he was throwing up or anything like that . . . ." (Defs.' Mot. Ex. I, Street Dep. Tr. 24:5-14). Nor did he observe Gurley stop at the officers' station after the incident in the restroom. (*Id.* at Tr. 22-23). This is the last communication on record concerning Gurley's status that evening.

The following morning, August 6, 2011, Gurley was found unresponsive by his bunk mate, Warren Hamilton. (Plf.'s Resp. Ex. 22, Hamilton Aff. ¶ 3). At approximately 7:30 a.m., Gurley was pronounced dead. (*Id.* at Ex. 14, Gurley Medical Records). An autopsy later revealed that Gurley "died of acute peritonitis caused by perforated acute appendicitis", commonly referred to as a ruptured appendix. (*Id.* at Ex. 4, Autopsy).

In late November 2012, Gurley's Estate (the "Estate") filed suit. The complaint named a number of Michigan Department of Corrections officers and medical personnel who interacted with Gurley in the hours leading up to his death.[5] For reasons that are largely irrelevant, many of the original Defendants were dismissed and the Estate was granted leave to file an amended complaint. *See Ruth v. Michigan Dep't of Corr.*, No. 12-15251, 2014 WL 1319685 (E.D. Mich. Apr. 1, 2014). In lieu of filing an amended complaint, the Estate instituted a new action on July 22, 2014. That case, like it's predecessor, was

---

[5] Gurley's original suit was assigned to the Honorable Patrick J. Duggan. *See Ruth v. Michigan Dep't of Corr.*, *et al*, Case No. 12-15251.

assigned to the Honorable Patrick J. Duggan. Shortly after Judge Duggan resolved Defendants' procedural challenges, the matter was transferred to the undersigned.[6] *See Merritt-Ruth v. Latta*, No. 14-12858, 2015 WL 736545 (E.D. Mich. Feb. 20, 2015). At this point, only three Defendants remain: Fritz and Officers Susan Frey-Latta and Thomas Blair, each of whom seek summary judgment in their favor.

## II.  Legal Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir.2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

---

[6] Judge Duggan retired from the bench in September 2015.

**III. Analysis**

    **A. Count I- Deliberate Indifference to Serious Medical Need**

In Count I, the Estate asserts that Defendants Blair, Latta, and Fritz were deliberately indifferent to Gurley's medical needs in violation of the Eighth Amendment. Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976).

The Eighth Amendment protects prisoners from the "unnecessary and wanton infliction of pain." *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). Where a prisoner alleges that such a violation occurred through a lack of proper medical care, "it is not necessary that the . . . officials consciously sought to inflict pain by withholding treatment." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). Rather, "[w]here prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citing *Estelle*, 429 U.S. at 104). "Fundamentally, the concept underlying the Eighth Amendment is nothing less than the dignity of humankind." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 564, 568 (6th Cir. 2013) (internal quotations, omissions, and modifications omitted).

A constitutional claim for denial of medical care has objective and subjective components. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "Satisfying the objective

component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component 'ensures that the defendant prison official acted with a sufficiently culpable state of mind.' " *Quigley v. Toung Vinh Thai*, 707 F.3d 675, 681 (6th Cir.2013) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir.2003)).

### 1. Objective Component

The objective component requires the plaintiff to demonstrate that the medical need is "sufficiently serious." *Blackmore*, 390 F.3d at 895. "As the Supreme Court explained in *Farmer*, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). In *Blackmore,* the Sixth Circuit specifically recognized that an inmate later found to be suffering from appendicitis demonstrated an objectively "serious need" where he exhibited "obvious manifestations of pain and injury" for an extended amount of time. 390 F.3d at 899-900. The parties do not dispute that the risk of harm to Gurley's health was substantial; after all, he tragically died after suffering from a ruptured appendix. In light of Defendants' concession, the Court need not consider the issue further. *See* (Defs.' Mot. 10).

### 2. Subjective Component

The subjective component requires Gurley to show that Defendants had "a sufficiently culpable state of mind in denying medical care." *Brown*, 207 F.3d at 867. The focus here is on Defendants "current attitudes and conduct." *Blackmore*, 390 F.3d at 895. Under *Farmer,* Gurley must demonstrate that (1) "the official being sued subjectively perceived facts from which to infer substantial risk to the [plaintiff]," (2) the official "did in fact draw that inference," and (3) the official "then disregarded that risk." *Quigley*, 707 F.3d at 681. "The

official's subjective knowledge of the substantial risk can be proven in the usual ways, including inference from circumstantial evidence." *Id.* (internal quotations omitted). "Knowledge of the asserted serious needs or circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). On the other hand, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. 825, 844 (1994). The "subjective component must be addressed for each officer individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

### a. Nurse Fritz

Fritz's first and only interaction with Gurley occurred on the morning of August 5, 2011. While failing to cite a single case, the Estate argues, in essence, that the treatment rendered by Fritz that morning was so below the standard of care that it supports a finding of deliberate indifference under the Eighth Amendment. While it is true that a claim of inadequate medical treatment may state a constitutional claim, the Sixth Circuit has cautioned that such claims are generally limited to situations where the care "is so cursory as to amount to no treatment at all . . . ." *Terrance v. Northviell Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002). In *Dominguez v. Corr. Med. Servs.*, for example, the court held that "[w]hile there was nothing inappropriate about [nurse] Fletcher's initial treatment instructions, Fletcher's care demonstrate[d] deliberate indifference when she informed Dominguez that despite his serious symptoms she would not see him" for nearly four hours. 555 F.3d 543, 551 (6th Cir. 2009). And, by the time Fletcher did get around to "treating"

11

Dominguez, she failed to take his core temperature and allowed him to return to his non-air-conditioned cube despite the fact that he "had vomit on his clothes, and he vomited again during the examination." *Id.* Perhaps most troubling of all, when Dominguez was later discovered unconscious in his cell, "Fletcher informed the guard that Dominguez's care would have to wait another twenty-five minutes . . . . " *Id.*

*Dominguez* is representative of the level of conscious disregard necessary to support a constitutional claim of inadequate medical care. *See Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 486 (6th Cir. 2014) ("A jury could find that Allison consciously exposed Sours to an excessive risk of serious harm by failing to arrange for insulin injections or medical care" despite knowing Sours was diabetic and "would be without insulin for five days . . . ."). This approach is informed by the well-accepted proposition that where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas* 537 F.2d 857, 860 n.5 (6th Cir. 1976). While there is no question that Fritz's diagnosis was patently wrong, the Court is not convinced that she was deliberately indifferent to Gurley's medical needs.

As a preliminary matter, there's nothing in the record to suggest that Fritz subjectively perceived Gurley's health to be in substantial risk. On the contrary, she seemingly ruled out the most obvious sign of appendicitis–bowel inactivity–after giving Gurley a laxative and noting that bowel sounds "were present in all four quadrants." (Ex. A, Fritz Aff. ¶ 5). After conducting a "chemstrip" test of Gurley's urine, the record indicates that Fritz inferred he was likely suffering from a UTI. "The fact that this conclusion was incorrect, or even

12

unreasonable, does not affect [the Eighth Amendment] analysis." *Cairelli v. Vakilian*, 80 Fed. App'x. 979, 984 (6th Cir. 2003). As the court aptly explained in *Cairellli,* where a doctor "is presented with symptoms that could indicate heart attack or indigestion and the doctor treats indigestion when the problem is actually a heart attack, we are hard pressed to find deliberate indifference without a showing of subjective awareness, even when the decision to treat indigestion is unreasonable." *Id.* at *985. That analogy is particularly fitting here: Fritz, who is not a physician, noted symptoms that were arguably indicative of appendicitis and a urinary infection. Relying on her own training and the independent judgment of the treating physician, she misdiagnosed Gurley's condition. That tragedy does not amount to deliberate indifference under *Dominguez* and its progeny.

Nor does it make a difference, as Gurley's experts suggest, that Fritz failed to follow proper medical protocol. As the court held in *Rouster v. County of Saginaw*, the "failure to follow best medical practices is not necessarily evidence of deliberate indifference if [the treating professional] did not *know* that [the underlying pain] was caused by a serious ailment." 749 F.3d 437, 449 (6th Cir. 2014) (emphasis in original). In other words, even assuming it was "obvious to a lay person that [Gurley] suffered from some kind of serious illness, [Fritz] was not subjectively aware that [Gurley] was suffering from a more serious condition . . . .", *Id.* at 451, because she was following "the protocol for genitourinary." (Ex. 13, Fritz Dep. Tr. 27:7); *see also Farmer*, 511 U.S. at 844 (concluding that prison officials may show that they were unaware of a risk, even an obvious one, by proving that they were unaware of the facts indicating significant danger or that they believed the risk posed by known facts was insignificant). Therefore, the Estate has not presented sufficient evidence

13

from which a reasonable juror could conclude that Fritz was deliberately indifferent to Gurley's medial needs.

### b. Officers Blair and Latta

The analysis with respect to Officers Blair and Latta largely hinges on the third *Farmer* factor; that is, whether a jury could conclude that they disregarded a perceived risk of substantial harm to Gurley. This is so because the first two layers of the subjective component cut in favor of the Estate. Indeed, Officer Blair conceded that he "understood from their interaction that Gurley was ill and needed to see healthcare." (Defs.' Br. 18). And for good reason; upon learning that Gurley "was having stomach issues and blood in his stool", (Ex. 19, Blair Dep. Tr. 12:17-18), Blair maintains that he immediately contacted healthcare and sought counsel. (*Id.* at Tr. 13:13-19); (Tr. 14:23-25). This reasoning applies with equal force to Officer Latta. She admitted to having a conversation with Gurley about his medical lay-in status and, according to the testimony of James Street, she observed "Gurley bent over walking slowly, groaning in pain holding his stomach clearly in severe discomfort", but "said nothing." (Plf.'s Resp. Ex. 22, Street Aff. ¶ 2). Street further remarked that the vomiting sounds "Gurley made [in the restroom] were loud enough where [Latta] would have been in a position to hear them." *Id.* In this way, there is, at a minimum, a question of fact concerning whether Blair and Latta "subjectively perceived facts from which to infer substantial risk to [Gurley]." *Harris v. City of Circleville*, 583 F.3d 356, 368 (6th Cir. 2009)

But the inquiry does not end there. The Estate must also show that Blair and Latta disregarded the perceived risk to Gurley's well-being. This is a much closer question. Starting with Blair, the Estate tendered two affidavits directly contradicting his testimony

14

that Gurley was sent back to healthcare for treatment on the evening of August 5. *See* (Ex. 18, Jones. Aff. ¶¶ 7-11) ("I was with [Gurley] when officer Blair had contact with him . . . we begged Blair to please call Health Care and send [him] over there. Blair just refused); Ex. 8, Stevenson Aff. ¶ 5). In response, Blair argues that even if the Court does credit those statements, Gurley himself "confirmed with Latta later that evening that he had been sent to healthcare where he was put on the call list for the next morning." (Defs.' Reply 6). But even assuming Gurley did make such an admission, which is impossible to verify, accepting Blair's argument necessarily requires the Court to weigh two competing lines of testimony. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . . " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Granting summary judgment under these circumstances would run directly counter to these fundamental propositions.

Latta's argument on this score fails for a much more basic reason; namely, she has failed to produce any evidence suggesting that she took steps to actively mitigate the risk to Gurley's health. In fact, Latta seemingly disregarded this issue in her brief, opting instead to focus on the first two *Farmer* factors. *See* (Defs. Mot. 19) ("Frey-Latta's conduct meets neither the first or second part of the subjective component."). If the testimony of Street is to be believed, Latta, who was aware of Gurley's medical lay-in status, observed him "bent over walking slowly, groaning in pain holding his stomach clearly in severe discomfort[,]" yet she "said nothing." (Ex. 22, Street Aff. ¶ 2). This void necessarily creates a question of fact. In sum, viewing the evidence in a light most favorable to the Estate, the Court finds

15

that a reasonable juror could conclude that Officers Blair and Latta subjectively perceived facts from which to infer substantial risk to Gurley, that they did in fact draw the inference, and that they nonetheless disregarded the risk. It is for the jury to decide if Blair and Latta are credible.

### B. Count III- Gross Negligence

The Estate also asserts one count of state-law "gross negligence" against Fritz, Blair, and Latta based on the same facts giving rise to the Eighth Amendment claim in Count I. Defendants argue that they are entitled to governmental immunity under Mich. Comp. Laws. § 691.1407(2). That statute provides that government employees are "immune from tort liability" if all of the following conditions are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

*Id.; Stanton v. City of Battle Creek*, 647 N.W.2d 508, 513 (Mich. Sup. Ct. 2002). Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. Furthermore, the grossly negligent misconduct must be *the* proximate cause" of the injury. *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004) (emphasis in original) (citations and internal quotation marks omitted). This standard "suggests . . . almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched

16

the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Id.* at 339– 40.

Here, Defendants make two arguments: First, they maintain that their conduct did not rise to the level of recklessness required under *Tarlea*. This argument is predicated on the same reasoning employed by Defendants in support of dismissing the Estate's Eighth Amendment claim. In the alternative, Defendants maintain that even if their conduct was grossly negligent, it was not the proximate cause of Gurley's death.

With respect to Nurse Fritz, the Estate has failed to produce evidence establishing that she was grossly negligent. Upon learning of Gurley's symptoms, Fritz instructed Officer Jones to send him to the infirmary for treatment. Once there, Fritz began probing Gurley's medical history and asking a battery of questions about his symptoms. Initially, she concluded that Gurley was likely suffering from constipation, and provided him with a laxative. Further testing also revealed that Gurley had leukocytes present in his urine; a common symptom of a UTI. Based on Fritz's clinical observations and the judgment of the treating physician, Gurley was diagnosed with a UTI. Despite arriving at the wrong result, Fritz's treatment methodology was not unreasonable, and certainly not reckless. "Simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012) (citations omitted).

Setting aside the merits, the Estate "did not respond or even mention [the state law] claims in [its] opposition[] to Defendants' motion." *Colston v. Cleveland Pub. Library*, No. 12-204, 2012 WL 3309663, at *2 (N.D. Ohio Aug. 13, 2012), aff'd, 522 F. App'x 332 (6th

17

Cir. 2013). The Estate's refusal to address the substance of Counts Three and Four is tantamount to abandonment. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003) (stating that a plaintiff's failure to brief a claim in the district court is an abandonment of the claim). For that additional reason, the Court must, and does, GRANT Defendants' motion with respect to Count III.

### C. Count IV- Acting in Concert

Finally, under Count IV, the Estate asserts that Defendants "acted in concert." Even assuming this claim was not waived for the same reasons previously discussed, it lacks event a hint of merit. "Like conspiracy, the tort of acting in concert includes an element of scienter. Regarding a claim for acting in concert, the Restatement explains: 'Parties are acting in concert when they act in accordance with *an agreement to cooperate* in a particular line of conduct or to accomplish a particular result.' " *In re Welding Fume Prod. Liab. Litig.*, 526 F. Supp. 2d 775, 806 (N.D. Ohio 2007). More specifically, "a plaintiff must show that (1) a single plan existed, (2) the defendants shared in the general conspiratorial objective to deprive plaintiff of his constitutional or federal statutory rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff." *Trans Rail Am., Inc. v. Hubbard Twp.*, 478 F.App'x 986, 988 (6th Cir. 2012) (all citations and quotations marks omitted).

Simply put, there has been no evidence offered to suggest that Defendants shared a common conspiratorial objective, let alone hatched a scheme to deprive Gurley of medical care. Accordingly, the Court GRANTS Defendants' request to dismiss Count IV.

## IV. Conclusion

For the reasons thus stated, the Court hereby GRANTS IN PART Defendants' motion for summary judgment. [86]. More specifically, the Court DISMISSES all claims against Defendant Beth Fritz, and DISMISSES Counts III and IV as to all remaining Defendants.

SO ORDERED.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: November 21, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 21, 2016, by electronic and/or ordinary mail.

        s/Carol J. Bethel
        Case Manager